**HUNTON ANDREWS KURTH LLP**
Jason J. Kim (SBN 221476)
kimj@hunton.com
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Telephone: 213 • 532 • 2114
Facsimile: 213 • 532 • 2020

Attorneys for Plaintiffs
Rocky Patel Premium Cigars, Inc., Oliva Cigar Co., Piloto Cigars, Inc. d/b/a Padrón Cigars, Inc., A. Fuente & Co., LLC, Ashton Distributors, Inc., Premium Imports, Inc. d/b/a La Flor Dominicana, My Father Cigars, Inc., Cigar Rights of America, and Premium Cigar Association

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| Rocky Patel Premium Cigars, Inc., Oliva Cigar Co., Piloto Cigars, Inc. d/b/a Padrón Cigars, Inc., A. Fuente & Co., LLC, Ashton Distributors, Inc., Premium Imports, Inc. d/b/a La Flor Dominicana, My Father Cigars, Inc., Cigar Rights of America, and Premium Cigar Association,<br><br>Plaintiffs,<br><br>v.<br><br>Robert Andres Bonta, in his official capacity as Attorney General of the State of California,<br><br>Defendant. | Case No. 8:25-cv-02244<br><br>Hon. Mónica Ramírez Almadani<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: December 15, 2025<br>Time: 1:30 PM<br>Ctrm: 9B |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 15, 2025 at 1:30 PM, or as soon thereafter as this matter may be heard before the above entitled Court, located at the Ronald Reagan Federal Building and United States Courthouse, 411 West 4th Street, Courtroom 9B, Santa Ana, CA 92701, and before the Honorable Mónica Ramírez Almadani, Plaintiffs Rocky Patel Premium Cigars, Inc., Oliva Cigar Co., Piloto Cigars, Inc. d/b/a Padrón Cigars, Inc., A. Fuente & Co., LLC, Ashton Distributors, Inc., Premium Imports, Inc. d/b/a La Flor Dominicana, My Father Cigars, Inc., Cigar Rights of America, and Premium Cigar Association, by and through undersigned counsel, will and hereby do move this Court for a preliminary injunction against Defendant Robert Andres Bonta, in his official capacity as Attorney General of the State of California, pursuant to Federal Rule of Civil Procedure 65, to prohibit Defendant from enforcing Assembly Bill 3218 and its implementing regulations (hereinafter referred to as the Unflavored Tobacco List Regulatory Scheme) against premium cigars, as those are defined under the federal regulatory regime at 21 C.F.R. § 1114.3.

This Motion is based on this Notice and Motion, the supporting Memorandum of Points and Authorities, the accompanying declaration and exhibits filed herewith, the pleadings on file in this case, and the oral argument of counsel at the hearing on this Motion, and such other and further evidence as the Court might deem proper.

DATED: November 17, 2025

Respectfully submitted,
HUNTON ANDREWS KURTH LLP

/s/ *Jason J. Kim*
Jason J. Kim
*Counsel for Plaintiffs*

# TABLE OF CONTENTS


INTRODUCTION........1

FACTUAL BACKGROUND........2

LEGAL STANDARD........6

ARGUMENT........6

I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims........6

A. The Unflavored Tobacco List Regulatory Scheme Is Preempted by the Preemption Clause In 21 U.S.C. § 387p of the Family Smoking Prevention and Tobacco Control Act........6

1. Congress Exclusively Reserved to the Federal Government the Authority to Require Tobacco Products to Pass through Premarket Review........8

2. The Unflavored Tobacco Product List Regulatory Scheme Establishes an Additional Premarket Review System for Tobacco Products........8

3. The Family Smoking Prevention and Tobacco Control Act Expressly Preempts the Unflavored Tobacco List Regulatory Scheme........9

4. The Unflavored Tobacco List Regulatory Scheme Is Also Impliedly Preempted........13

B. Cal. Health & Safety Code § 104559.1 Violates Plaintiffs' First Amendment Commercial Speech Rights........15

II. Plaintiffs Will Suffer Irreparable Injury if Preliminary Relief is Not Granted........19

III. The Balance of Hardships and Public Interest Favor a Preliminary Injunction........21

CONCLUSION........22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Trucking Ass'ns v. Los Angeles*
559 F.3d 1046 (9th Cir. 2009) .......... 21

*ArchitectureArt, LLC v. San Diego*
231 F. Supp. 3d 828 (S.D. Cal. 2017) .......... 18

*Ass'n Des Eleveurs De Canards et D'Oies Du Quebec v. Harris*
2012 WL 12842942 (C.D. Cal. Sept. 28, 2012) .......... 20

*Assurance Wireless USA, L.P. v. Reynolds*
100 F.4th 1024 (9th Cir. 2024) .......... 20

*Bd. of Trs. of State Univ. of NY v. Fox*
492 U.S. 469 (1989) .......... 18

*Bioganic Safety Brands, Inc. v. Ament*
174 F. Supp. 2d 1168 (D. Colo. 2001) .......... 21

*Buckman Co. v. Plaintiffs' Legal Comm.*
531 U.S. 341 (2001) .......... 13, 14

*BV Eng'g v. UCLA*
858 F.2d 1394 (9th Cir. 1988) .......... 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY*
447 U.S. 557 (1980) .......... 16, 18

*Cigar Ass'n of Am. v. FDA*
480 F. Supp. 3d 256 (D.C. Cir. 2020) .......... 8

*Crosby v. Nat'l Foreign Trade Council*
530 U.S. 363 (2000) .......... 13

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*
82 F.4th 664 (9th Cir. 2023) .......... 19

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*
98 F.4th 1180 (9th Cir. 2024) .......... 6

*Grand River Enters. Six Nations v. Knudsen*
2024 WL 2992503 (9th Cir. June 14, 2024) .................... 13

*Hernandez v. Sessions*
872 F.3d 976 (9th Cir. 2017) .................... 19

*Hines v. Davidowitz*
312 U.S. 52 (1941) .................... 13

*Hubbard v. San Diego*
139 F.4th 843 (9th Cir. 2025) .................... 21

*Int'l Franchise Ass'n v. Seattle*
803 F.3d 389 (9th Cir. 2015) .................... 21

*Iowa Pork Producers Ass'n v. Bonta*
2022 WL 1042561 (C.D. Cal. Feb. 28, 2022) .................... 15

*Iowans for Alternatives to Smoking & Tobacco v. Iowa Dep't of Revenue*
781 F. Supp. 3d 724 (S.D. Iowa 2025) .................... 14, 15

*Nat'l Ass'n of Tobacco Outlets v. Providence*
731 F.3d 71 (1st Cir. 2013) .................... 10

*Nexus Pharms. v. Cent. Admixture Pharmacy Servs.*
48 F.4th 1040 (9th Cir. 2022) .................... 13

*R.J. Reynolds Tobacco Co. v. County of Los Angeles*
29 F.4th 542 (9th Cir. 2022) .................... 7, 10, 11, 12

*Rubin v. Coors Brewing Co.*
514 U.S. 476 (1995) .................... 18

*Sorrell v. IMS Health Inc.*
564 U.S. 552 (2011) .................... 16

*Stuhlbarg Int'l Sales v. John D. Brush & Co.*
240 F.3d 832 (9th Cir. 2001) .................... 20

*Sun v. Santacruz*
2025 WL 2730235 (C.D. Cal. Aug. 26, 2025) .................... 6

*Thompson v. W. States Med. Ctr.*
535 U.S. 357 (2002) .................... 18

*U.S. Smokeless Tobacco Mfg. Co. v. City of New York*
708 F.3d 428 (2d Cir. 2013) .......... 10, 12

*Video Gaming Techs., Inc. v. Bureau of Gambling Control*
356 F. App'x 89 (9th Cir. 2009) .......... 20

*Winter v. NRDC, Inc.*
129 S. Ct. 365 (2008) .......... 6

**STATUTES AND OTHER AUTHORITIES**

21 U.S.C. § 332 .......... 2

21 U.S.C. § 333 .......... 2

21 U.S.C. § 334 .......... 2

21 U.S.C. § 387 .......... passim

21 U.S.C. § 387p(a)(2)(A) .......... 9

21 C.F.R. § 1114.1(d) .......... 3

21 C.F.R. § 1114.3 .......... passim

Cal. Code Reg. tit. 11, § 942 .......... 4

Cal. Code Reg. tit. 11, § 945 .......... 4, 9

Cal. Code Reg. tit. 11, § 946 .......... 4

Cal. Code Reg. tit. 11, § 948 .......... 14

Cal. Code Reg. tit. 11, § 949 .......... 4, 9

Cal. Code Reg. tit. 11, § 950 .......... 9

Cal. Code Reg. tit. 11, § 954 .......... 4

Cal. Health & Safety Code § 104559.1 .......... passim

Cal. Health & Safety Code § 104559.5 .......... 3, 4, 7, 11

A.B. 3218, Gen. Assemb., Reg. Sess. (Cal. 2024) .......... 3

S.B. 793, Gen. Assemb., Reg. Sess. (Cal. 2020) .......... 3, 7, 12

# INTRODUCTION

Through Assembly Bill 3218, the California legislature enacted the Unflavored Tobacco List statute, which becomes effective on January 1, 2026. The statute and its implementing regulations have resulted in the California Attorney General establishing a process to review every tobacco product before it can go on the market in California. Only tobacco products that the Attorney General chooses to place on his "Unflavored Tobacco List" may remain on the shelves of California retailers.

In reaching such a result, the Unflavored Tobacco List regulatory scheme establishes the Attorney General as the State's very own United States Food and Drug Administration ("FDA"), which Congress exclusively charged with running a "premarket review" process for tobacco products. For that reason, the Unflavored Tobacco List regulatory scheme is preempted by federal law—specifically the federal Family Smoking Prevention and Tobacco Control Act—and violates the Supremacy Clause of the United States Constitution.

The Unflavored Tobacco List regulatory scheme also requires the Attorney General to select products for increased regulatory burdens based on how they are described, as opposed to their physical characteristics. The scheme, thus, restricts commercial speech, without justification adequate to meet First Amendment scrutiny.

This Court should preliminarily enjoin enforcement of the Unflavored Tobacco List regulatory scheme pending final judgment in this matter. There are many legal problems with the scheme, as detailed in the amended complaint in this case. The Plaintiffs are particularly likely to succeed on two federal law claims—that the scheme is preempted by federal law and violates the First Amendment to the United States Constitution.

Plaintiffs are seeking a limited preliminary injunction, tailored to the products they predominantly offer: Premium cigars, as defined by the federal regulatory

system. Under the federal regulatory system, premium cigars are made by hand, from the most expensive and select all-natural tobacco, with no additional ingredients, and without added artificial flavors. 21 C.F.R. § 1114.3.

The California Unflavored Tobacco List regulatory scheme has two unique interactions with premium cigars. First, if the point of the Unflavored Tobacco List regulatory scheme is to detect flavored tobacco products, it is a meaningless waste of time and money for premium cigars, as those products cannot be flavored under federal law. Second, the scheme is *spectacularly expensive and burdensome* for premium cigars in particular. That is because the scheme requires a separate, voluminous application and fee for each "Stock Keeping Unit" of cigars, and premium cigar manufacturers have hundreds if not thousands of them.

A preliminary injunction is necessary to prevent irreparable harm, from the economic damages of the invalid scheme that are not easily recoverable from the State to the chilling of Plaintiffs' commercial speech, which is a paradigmatic form of irreparable injury. The balance of equities and the public interest also counsel in favor of the injunction. Because premium cigars are not flavored, compliance with the scheme is an exercise in busy work and State rent taking. The injunction—limited as requested—presents no risk of a flavored product entering the market, so that no meaningful state regulatory purpose will be curtailed by it.

## FACTUAL BACKGROUND

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act, granting the FDA authority to regulate tobacco products and establishing a detailed and large premarket review system. Under that system, manufacturers of tobacco products must submit most tobacco products entering the market after 2007 for extensive testing, document review, and affirmative approval. 21 U.S.C. § 387j(a)(1)-(2). Manufacturers are subject to civil or criminal penalties for continuing to sell a tobacco product that must obtain FDA premarket review approval, but has not done so. 21 U.S.C. §§ 332-334, 387(b), 387(c)(6).

Premium cigars are defined in the federal regulatory system as those made by hand, entirely from natural tobacco, and without any artificial flavors. 21 C.F.R. § 1114.3. They constitute fewer than 3 percent of all cigars—and 0.1 percent of all tobacco products—sold in the United States. The FDA has exempted this limited class of cigars from having to pass through the premarket review system, explaining that they present the "lowest risk" of tobacco products due to their lack of added flavors and youth usage. *See* 21 C.F.R. § 1114.1(d) ("This part does not apply to 'premium' cigars as defined in § 1114.3."); U.S. Food and Drug Administration, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised)** at 31 (April 30, 2020), https://www.fda.gov/media/133880/download (stating that premium cigars are the agency's lowest enforcement priority with respect to the premarket authorization requirements).

In 2020, the State of California passed a statutory ban on certain flavored tobacco products, in a measure directed principally at an epidemic of flavored vaping devices used by youth. *See* S.B. 793, Gen. Assemb., Reg. Sess. (Cal. 2020), *codified at* Cal. Health & Safety Code § 104559.5. That law prohibits the sale of tobacco products with a characterizing flavor other than tobacco, with penalties on retailers if such sales are detected. *See* Cal. Health & Safety Code § 104559.5(b), (f).

In September 2024, the State went a step further, enacting Assembly Bill 3218. *See* Assembly Bill 3218, Gen. Assemb., Reg. Sess. (Cal. 2024). That statute established the Unflavored Tobacco List regulatory scheme, seeking directly to regulate manufacturers (rather than retailers) of tobacco products and requiring them to obtain the Attorney General's pre-approval of their products before putting them on the California market. Cal. Health & Safety Code § 104459.1(a). Only after the Attorney General places a tobacco product on his "Unflavored Tobacco List," may it enter California. Otherwise, it cannot be sold in the State and must be actively removed from all California retailer shelves. *See* Cal. Health & Safety Code §

104559.1; *id.* § 104559.5.

The Attorney General issued implementing regulations on August 6, 2025. *See* Cal. Code Reg. tit. 11, § 942 *et seq.* These regulations require that manufacturers submit a mountain of information and materials—including all marketing and labeling materials, ingredient lists, and product samples—to get just one tobacco product approved. *See, e.g.*, Cal. Code Reg. tit. 11, §§ 945, 946, 949. Manufacturers must repeat this for each "Stock Keeping Unit." *See* Cal. Code Reg. tit. 11, §§ 942(r), 946. Moreover, the Attorney General chose to charge a sizeable fee for each Stock Keeping Unit, including an annual registration renewal fee. *See* Cal. Code Reg. tit. 11, § 954.

For premium cigar manufacturers, this is backbreaking. Most tobacco products are made by machines rolling off hundreds of millions of identical cigarettes or mass-produced cigars. But premium cigars are made by hand, from the best tobacco selected from a harvest. This results in one brand having hundreds if not thousands of different blends of tobacco and shapes and sizes of cigars, albeit all made only from natural tobacco and without artificial flavors. *See* Declaration of Michael J. Edney ("Edney Decl."), Ex. A at ¶¶ 4–6. The largest cigarette companies could submit to the Attorney General a couple dozen applications and preserve their entire product offering. In contrast, a premium cigar manufacturer, in many cases, would need to submit hundreds or thousands. *See* Edney Decl., Ex. B at ¶¶ 6–7. And that means hundreds of thousands of dollars in annual fees and remarkable investments in time and energy to compile the applications. Because the Attorney General issued implementing regulations on August 6, 2025, and set a deadline for applications just a few weeks later on October 9, 2025, many premium cigar manufacturers were simply not able or could not afford to submit applications for the breadth of their offerings. On January 1, 2026, when the regulatory scheme takes effect, thousands of premium cigar products will be jettisoned from the California market in the

absence of a preliminary injunction.

The Unflavored Tobacco List regulatory scheme also creates a presumption that a tobacco product is flavored based on nothing more than statements or claims made by a manufacturer or importer that explicitly or implicitly communicate to the public that the product has a characterizing flavor. Cal. Health & Safety Code § 104559.1(d). For premium cigars, that is a particular problem. They are made only of tobacco, with no artificial flavors. But because they are artisan products, manufacturers, retailers, reviewers, and writers frequently attempt to describe special blends by reference to the aromas and tastes of other products, from leather to fruits and herbs to other food products. This is exactly what happens with descriptions of fine wine. But these descriptions do not make wine other than the product of pressed grapes, and they do not make premium cigars other than hand crafted from only all-natural tobacco.

The Plaintiffs in this case are the Nation's leading premium cigar manufacturers and two trade associations, one (Cigar Rights of America) representing manufacturers of premium cigars and the other (the Premium Cigar Association) corner-store tobacconists that specialize in premium cigars. The Plaintiffs and their members stand to lose tens of millions of dollars in the absence of a preliminary injunction.

They brought this case on October 3, 2025. This Court denied a temporary restraining order against the submission deadline on state law grounds, challenging the Attorney General's regulations setting the deadline and mandating other burdens under the California Administrative Procedure Act, due to Eleventh Amendment concerns. *See* Order, *Rocky Patel Premium Cigars, Inc. v. Bonta*, No. 8:25-cv-02244-MRA-PD (C.D. Cal. Oct. 8, 2025). The state law claim has since been filed in the Superior Court of Los Angeles County and amended out of the federal complaint. The Superior Court is scheduled to hear arguments on Plaintiffs' motion for a preliminary injunction on November 24, 2025. *See* Plaintiffs' Motion for a

Preliminary Injunction, *Rocky Patel Premium Cigars, Inc. v. Bonta*, Case No. 25STCV29644 (Cal. Sup. Ct. Oct. 28, 2025).

## LEGAL STANDARD

In the Ninth Circuit, courts employ a "sliding scale" variation of the traditional four-part test for preliminary relief, where a strong showing on one factor can make up for lesser showings on the others. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (confirming the viability of the Ninth Circuit's "sliding scale" variant of the Supreme Court's test from *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). A preliminary injunction is justified if a party "demonstrates (1) 'serious questions going to the merits,' (2) 'a likelihood of irreparable injury,' (3) 'a balance of hardships that tips sharply towards the plaintiff,' and (4) 'the injunction is in the public interest.'" *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Where the party opposing injunctive relief is a government entity, as here, the third and fourth factors merge. *See Sun v. Santacruz*, 2025 WL 2730235, at *2 (C.D. Cal. Aug. 26, 2025).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Plaintiffs are likely to succeed on the merits of their claims; in particular, that (1) the Unflavored Tobacco List regulatory scheme is preempted by the Family Smoking Prevention and Tobacco Control Act; and (2) Cal. Health & Safety Code § 104559.1 violates Plaintiffs' First Amendment commercial speech rights.

#### A. The Unflavored Tobacco List Regulatory Scheme Is Preempted by the Preemption Clause In 21 U.S.C. § 387p of the Family Smoking Prevention and Tobacco Control Act.

The Unflavored Tobacco List regulatory scheme is preempted by the Family Smoking Prevention and Tobacco Control Act. The Act provides that "[n]o . . . State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of

this subchapter relating to . . . premarket review." 21 U.S.C. § 387p(a)(2)(A). The Unflavored Tobacco List regulatory scheme establishes an "addition[al]" system of "premarket review" with "different" requirements than the federal system. *Id*. It is therefore preempted.

The Unflavored Tobacco List regulatory scheme is not protected from preemption by the Family Smoking Prevention and Tobacco Control Act's savings clause, which permits States to establish requirements with respect to "the sale" of tobacco products. 21 U.S.C. § 387p(2)(b). Under Ninth Circuit precedent, a State or authorized subdivision thereof may ban the retail sale of a category of tobacco products. *See R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542 (9th Cir. 2022). California has a separate statute that does precisely this, completely barring the sale in the State tobacco products with a characterizing flavor other than tobacco. *See* S.B. 793, Gen. Assemb., Reg. Sess. (Cal. 2020), *codified at* Cal. Health & Safety Code § 104559.5. And that law is not being challenged here. The Unflavored Tobacco List law is, which takes the extraordinary additional step of establishing a separate, additional, and different process directly regulating the manufacturers of tobacco products and requiring them to seek a regulator's approval before placing their product on the market for sale. That is a "premarket review" system. 21 U.S.C. § 387p(a)(2)(A).

If the preemption provisions of the Family Smoking Prevention and Tobacco Control Act are to have any meaning, a State cannot implement a ban on the sale of certain tobacco products by way of its own premarket review scheme. That stands in distinction to conventional sale bans, which penalize market participants in arrears if qualifying products are found for sale. Any other interpretation of the preemption provisions would render the preemption clause's "premarket review" term superfluous. *See R.J. Reynolds*, 29 F.4th at 553, 559.

### 1. Congress Exclusively Reserved to the Federal Government the Authority to Require Tobacco Products to Pass through Premarket Review

In the 2009 Family Smoking Prevention and Tobacco Control Act, Congress required manufacturers of cigarettes, smokeless tobacco, and roll-your-own tobacco to apply to the FDA for authorization to enter or continue on the market. *See* 21 U.S.C. § 387j. Congress gave the FDA the authority, through rulemaking, to require other types of tobacco products, including cigars, to go through premarket review. *See* 21 U.S.C. § 387a.

In the premarket review process, manufacturers are required to submit to the FDA product samples, ingredient listings, labeling and marketing materials, and (in some cases) studies regarding the health effects of the products. *See* 21 U.S.C. § 387j(b)(1). The Commissioner of the FDA and the Secretary of the Department of Health and Human Services then exercise their judgment on whether to allow the products to be sold, by measuring them against certain statutory standards. *See* 21 U.S.C. § 387j(c).

In 2016, the FDA exercised its authority to require certain cigars and vaping devices to go through premarket review. After a series of judicial and agency rulings, the FDA now exempts a defined class of premium cigars from needing to pass through premarket review before entering the market. *See* 21 C.F.R. § 1114.3; *Cigar Ass'n of Am. v. FDA*, 480 F. Supp. 3d 256 (D.C. Cir. 2020). In the end, Congress left to the federal government decisions of whether and to what extent tobacco products must go through premarket review before being eligible for sale.

### 2. The Unflavored Tobacco Product List Regulatory Scheme Establishes an Additional Premarket Review System for Tobacco Products

The Unflavored Tobacco List statute and regulations establish a parallel and additional premarket review scheme for tobacco products. Under the Unflavored Tobacco List regulatory scheme, manufacturers must submit a separate set of

ingredient lists, product samples, marketing materials, and other information to the Attorney General before the products may be marketed in California. *See, e.g.*, Cal. Code Reg. tit. 11 §§ 945, 949. Only after the Attorney General reviews the material, exercises his judgment, and authorizes the product by adding it to a published list, may the manufacturer allow the product to enter California. *See* Cal. Health & Safety Code § 104559.1(a), (e); *see also* Cal. Code Reg. tit. 11 §§ 945, 950. Importantly, the Unflavored Tobacco List regulatory scheme does not bar a category of products and penalize those detected selling products falling in that category, which has been the form of prohibitions of various types of tobacco products throughout the country. Instead, it requires the submission of extensive information and an agency approval *before* a product goes to market in California.

### 3. The Family Smoking Prevention and Tobacco Control Act Expressly Preempts the Unflavored Tobacco List Regulatory Scheme

The Family Smoking Prevention and Tobacco Control Act has a unique, tripartite express preemption provision. 21 U.S.C. § 387p. It starts by recognizing States' long-standing authority to regulate tobacco products and "preserv[ing]" it, subject to the exception that follows. 21 U.S.C. § 387p(a)(1). A preemption provision comes next:

> No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement *which is different from, or in addition to, any requirement* under the provisions of this subchapter relating to tobacco product standards, *premarket review,* adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

21 U.S.C. § 387p(a)(2)(A) (emphases added). Standing alone, the import of this provision is clear: A State is prohibited from establishing its own "premarket review" scheme, "in addition to" the federal Government's system.

The preemption provision is followed by an "exception," often referred to in the cases interpreting it as a "savings clause." 21 U.S.C. § 387p(a)(2)(B). It provides

that the preemption provision "does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age . . . ." *Id.* Relevant here, the savings clause allows the State to impose "requirements relating to the sale" of "tobacco products."

The issue in this case is how to reconcile the preemption and savings clauses. Can a State establish a premarket review system, in addition to or different from the federal government's, if the State simply adds at the end of the statute that the product cannot be sold in the State if not first approved through the State premarket review system?

The answer to that question is "no." The savings clause is not a license for States to impose any requirement, simply by adding the statutory punchline that a non-compliant product cannot be sold in the State.

Several federal circuit courts, including the Ninth Circuit, have analyzed the preemption and savings clauses at length. *See R.J. Reynolds*, 29 F.4th 542 (upholding ban county ban on flavored tobacco products); *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428 (2d Cir. 2013) (upholding city law restricting sale of flavored tobacco products to certain retailers); *Nat'l Ass'n of Tobacco Outlets v. Providence*, 731 F.3d 71 (1st Cir. 2013) (upholding city law restricting the sale of flavored tobacco products to tobacco bars). In the Ninth Circuit, the guiding rule is that clauses must be interpreted to "give effect to each word and make every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous." *R.J. Reynolds*, 29 F.4th at 553. For shorthand, the Ninth Circuit called this exercise avoiding "superfluity problems," so that each preemption clause term retains some meaning and import and is not swamped by the savings clause or *vice versa*. *Id.* at 554.

In *R.J. Reynolds*, the Ninth Circuit focused on another term of the preemption clause, barring states from establishing requirements "relating to . . . tobacco product

standards." *Id.* at 553–58. The plaintiffs there had argued that Los Angeles's ban on the sale of flavored tobacco products was essentially setting a "tobacco product standard," because it (among other things) effectively prohibited adding flavors to tobacco products in the manufacturing process, at least if the products are to be sold in California. The Ninth Circuit, however, narrowly interpreted the preemption clause's reference to "tobacco product standards," as not reaching state and local bans on "the retail sale of finished products" in distinction to direct regulation of manufacturers or their procedures *Id.* at 555. States cannot dictate how tobacco products are made, but they can identify the characteristics of a completed product as grounds for prohibiting its sale. *Id.* Any other interpretation, the Ninth Circuit held, would effectively prevent states from defining a class of tobacco products for prohibition. *Id.* at 554.

The Ninth Circuit in *R.J. Reynolds* spent no time interpreting the term "premarket review" in the preemption clause, mentioning it only twice and only when quoting the statute itself. *Id.* But the principles of *R.J. Reynolds* counsel in favor of preemption in this case. The savings clause term—that allows States to establish "requirements relating to the sale of tobacco products"—clearly would have ample meaning if laws requiring tobacco products' passage through a state-level premarket review system as a condition of allowing their sale were preempted. The Los Angeles County law prohibiting the sale of flavored tobacco products at issue in *R.J. Reynolds* and the California statute doing the same so demonstrate. *See id.* at 551; Cal. Health & Safety Code § 104559.5. In the Ninth Circuit, States can specify the physical features of certain tobacco products and ban their sale, with penalties if the sale or possession of such products were detected.

If States, by contrast, could add a requirement to submit each product and substantial information about such product to a state agency for review and approval prior to being sold, the statutory "superfluity problem" would run in the opposite direction. Such an interpretation would read the term "premarket review" out of the

preemption clause. 21 U.S.C. § 387p(a)(2)(A). It would license States to establish their own premarket review systems "in addition to, or different than" the federal premarket review system, so long as they added a few words to the requirement that passing the State premarket review system was a condition of legal sale in the State. *R.J. Reynolds*, 29 F.4th at 562 (Nelson, J., dissenting). Such an interpretation would violate fundamental principles of statutory interpretation, recognized by the Ninth Circuit with respect to this particular statute, by depriving the preemption clause's term "premarket review" of any meaningful effect. *R.J. Reynolds*, 29 F.4th at 554. The preemption and savings clauses, after all, allow "state and local governments to opt out of the market" for particular tobacco products. *Id.* at 560. But they do not allow states to regulate manufacturers by specifying their production processes directly or making the manufacturers run though a premarket review gauntlet as a condition for entering the State. *Id.*

The Second Circuit's interpretation of the preemption and savings clauses reinforces that the Unflavored Tobacco List regulatory scheme is preempted. The savings clause's preservation of state authority to regulate sales allows States to bar sales "of finished products" that "depend[ ] on [their] characteristics as an end product." *U.S. Smokeless Tobacco*, 708 F.3d at 435. But it does not authorize States to directly command manufacturers to run their production processes in any particular way or through an approval gauntlet as the price of admission to retail stores in the State. *Id.*

Flavored tobacco product bans are not new. They have a conventional form: Defining the characteristics of finished product that trigger a sales ban and enforcing that ban in arrears against offending products. California has one of those laws, S.B. 793, Gen. Assemb., Reg. Sess. (Cal. 2020), and it is not challenged here. What is new is a State directly requiring manufacturers to pass through a preapproval process. That power is reserved to the federal government by the preemption clause's reference to "premarket review."

**4. The Unflavored Tobacco List Regulatory Scheme Is Also Impliedly Preempted**

Plaintiffs are likely to succeed on the merits of their implied preemption claim as well. "Even without an express provision for preemption[,]" state law "is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). This sort of "conflict preemption" is found where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

The Supreme Court has recognized Section 337(a) of the Federal Food, Drug, and Cosmetic Act ("FDCA")—of which the Family Smoking Prevention and Tobacco Control Act is a part—as "clear evidence that Congress intended" the FDCA to be "enforced exclusively by the Federal Government." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001). The Ninth Circuit in particular has "been protective of the FDA's statutory monopoly on enforcement authority." *Nexus Pharms. v. Cent. Admixture Pharmacy Servs.*, 48 F.4th 1040, 1048 (9th Cir. 2022). Thus, claims will be impliedly preempted where they exist "solely by virtue" of the FDCA. *Buckman*, 531 U.S. at 353 ("On the contrary, the existence of these federal enactments is a critical element in [plaintiffs] case . . . and [this litigation] is therefore pre-empted by that scheme."); *Nexus Pharms.*, 48 F.4th at 1047–48 (claim preempted where it was "based on state laws that incorporate federal law" and "a necessary element of Nexus's claim is the alleged violation of the FDCA"); *Grand River Enters. Six Nations v. Knudsen*, 2024 WL 2992503, at *2 (9th Cir. June 14, 2024) (finding that attorney general did not have authority to bring enforcement action where claim existed solely by virtue of the FDCA).

Whether the California Attorney General may approve a tobacco product depends in large part on how the FDA has treated it in the federal premarket review process. Indeed, a significant portion of the regulatory scheme, which details exactly

what information a product or variant application form must include, is dedicated to the provision of information pertaining to FDA's pre-market review process. And Cal. Code Reg. tit. 11, § 948 is titled "Impact of FDA Status on Listing and Removal," showing that the scheme is directed at an alternative pathway for enforcing federal law.

In this way, the Unflavored Tobacco List regulatory scheme creates a parallel state-level enforcement mechanism for the federal premarket review requirements. Violators of the Unflavored Tobacco List regulatory scheme are subject to escalating civil penalties and other costs. The Family Smoking Prevention and Tobacco Control Act and its premarket review system is a "critical element" to the Unflavored Tobacco List regulatory scheme. *Buckman*, 531 U.S. at 353. And the Unflavored Tobacco List regulatory scheme is "parasitic on the FDCA by conditioning sales based on FDA authorization status." *Iowans for Alternatives to Smoking & Tobacco v. Iowa Dep't of Revenue*, 781 F. Supp. 3d 724, 741 (S.D. Iowa 2025).

The *Iowa Department of Revenue* case is instructive of the consequences that follow. That case involved Iowa House File 2677, which orders the creation of a registry of electronic nicotine delivery systems (ENDS) products and requires manufacturers to certify the FDA marketing authorization status of their products before inclusion on the registry. *Id.* at 728. A product not on the registry cannot be sold in Iowa. *Id.* Like premium cigar products, most "ENDS products on the market today lack FDA marketing authorization." *Id.* And like Assembly Bill 3218, House File 2677 imposes initial and annual fees for each product and creates a "comprehensive enforcement regime," imposing "escalating civil penalties" for violations, contemplating permit suspensions, and allowing for unannounced compliance checks. *Id.*

Plaintiffs challenged the legality of House File 2677, arguing, *inter alia*, that it is impliedly preempted by the FDCA. The court agreed. It found that House File 2677, despite being characterized as a sales regulation, effectively encroaches upon

the federal government's exclusive enforcement authority under the FDCA (as amended by the Family Smoking Prevention and Tobacco Control Act) by conditioning market access on compliance with federal authorization standards. *Id.* at 737. This allows Iowa to "bring enforcement actions in its own name against manufacturers and retailers based on compliance with the FSPTCA's Premarket Tobacco Product Applications process—a federal requirement that Congress entrusted exclusively to FDA enforcement." *Id.* at 739. As the court summarized, the law's "operative effect is to create a state-level enforcement regime for federal premarket authorization requirements, with Iowa substituting its enforcement discretion for that of the FDA." *Id.*[1] That, the court held, was impermissible, and the Iowa law is preempted. *Id.*

The same result should obtain here. The Unflavored Tobacco List regulatory scheme is a parallel pathway for the State to enforce federal law, one that is unauthorized by Congress. It is preempted.

### B. Cal. Health & Safety Code § 104559.1 Violates Plaintiffs' First Amendment Commercial Speech Rights.

The statutory scheme establishes a rebuttable presumption that a tobacco product is prohibited, if the manufacturer or importer "has made a statement or claim directed to consumers or to the public that the tobacco product has or produces a characterizing flavor, including, but not limited to, any text, color, or images on the product's labeling or packaging, that explicitly or implicitly communicates that the tobacco product has a characterizing flavor." Cal. Health & Safety Code § 104559.1(d). In doing so, the statute restricts the manner in which premium cigar manufacturers and importers may describe their products and thus their commercial

[1] As the *Iowa Department of Revenue* court explained, the Supreme Court has instructed that "savings clauses do not affect the ordinary working of conflict preemption principles." *Id.* at 740 (quoting *Buckman*, 531 U.S. at 352). Assembly Bill 3218's usurpation of the FDA's enforcement discretion "conflicts with Section 337(a)'s reservation of enforcement authority to the federal government." *Id.*

speech. There is no justification for this restriction that meets the standards of the First Amendment to the United States Constitution.

"The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY*, 447 U.S. 557, 561 (1980). This is because commercial speech "assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.* The government's authority to restrict commercial speech that is not misleading or related to unlawful activity is limited to circumstances where: (1) the state has "a substantial interest to be achieved by restrictions on commercial speech"; and (2) the "regulatory technique" is "in proportion to that interest." *Id.* at 564. This second requirement "recognizes that the First Amendment mandates that speech restrictions be 'narrowly drawn.'" *Id.* at 565. "[T]hese standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011).

The Unflavored Tobacco List regulatory scheme goes far beyond identifying the physical characteristic of product and then prohibiting its sale. Instead, it attaches legal consequence to the very words that premium cigar manufacturers and importers use to describe the taste of their products. As with other specialty products, such as wine and whiskey, premium cigar producers and media outlets covering them regularly describe their products by analogy to certain aromas and tastes of non-tobacco products. They do so even though premium cigars are made only of tobacco and have no added flavors. *See* 21 C.F.R. § 1114.3.

For example, Plaintiff Ashton describes its Heritage Puro Sol premium cigars as having notes of "cocoa, cedar, leather, caramel, [and] spices."[2] Oliva describes its

[2] Ashton Distributors, "Ashton Heritage Puro Sol," ashtoncigar.com (2025), available at https://ashtoncigar.com/cigars/ashton/ashton-heritage-puro-sol.

Serie V premium cigar as "with rich coffee and dark chocolate tones [and] [a] subtle and well balanced spice[.]"[3] Padrón describes its Padrón 1964 Anniversary Series Torpedo (Natural) premium cigar as possessing "[n]otes of hazelnut" that "segue into a rich, opulent smoke of cocoa bean that settles onto the palate like the fine confections of a chocolatier."[4] RPPC describes its Conviction premium cigar as one in which "notes of caramel, honey, coffee, espresso, and chocolate intertwine harmoniously."[5] La Flor Dominicana describes its Andalusian Bull premium cigar as possessing flavors of "a myriad of spices and a touch of sweetness."[6] Arturo Fuente describes its Rare Pink Vintage 1960 premium cigars as "cedary and herbal" and taking on a "nutty, graham cracker sweetness."[7]

California law provides that, by using this language to describe their tasting notes, Plaintiffs' products are presumptively flavored and thus unlawful. Cal. Health & Safety Code § 104559.1(d). This approach is not proportionate to a legitimate state interest. First, the State has no interest in restricting how premium cigar manufactures and importers describe the tasting notes of their products because they are, by definition, unflavored. Indeed, because they are unflavored, premium cigars are among the lowest of FDA's enforcement priorities,[8] and they are unrelated to the considerations underlying the State's ban on flavored tobacco products. The state's interest in barring Plaintiffs from describing their products as having notes of "cocoa"

---

[3] Oliva Cigar, "The Serie V," olivacigar.com (2025), available at https://olivacigar.com/cigars/serie-v/.

[4] Padrón Cigars, "2021 Cigar Aficionado Cigar of the Year," padron.com (2025), available at https://padron.com/2021-cigar-aficionado-cigar-of-the-year/.

[5] Rocky Patel Premium Cigars, Inc., "Conviction," rockypatel.com (2025), available at https://www.rockypatel.com/cigar/conviction/.

[6] La Flor Dominicana, "Andalusian Bull," laflordominicana.com (2023), available at https://www.laflordominicana.com/andalusian-bull.

[7] Arturo Fuente Cigar, Co., "Arturo Fuente Rare Pink Vintage 1960's Series Sophisticated Hooker Awarded #10 in Cigar Aficionado's Top 25 Cigars of 2022," arturofuente.com (2025), available at https://arturofuente.com/title-arturo-fuente-rare-pink-vintage-1960s-series-sophisticatedhooker-awarded-10-in-cigar-aficionados-top-25-cigars-of-2022/.

[8] U.S. Food and Drug Administration, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised)** at 31 (April 30, 2020), https://www.fda.gov/media/133880/download. (last accessed November 6, 2025).

or "caramel" is no more acute than its interest in barring wine producers from describing a California cabernet as having rich blackberry or blueberry notes. Rather, consumers are better informed when commercial producers are accurately able to describe the characteristics of their products. *See Cent. Hudson*, 447 U.S. at 561.

In addition, the regulatory scheme is more restrictive than is necessary, because it could have (but did not) exclude premium cigars from the regulatory consequences of describing its tasting notes. If there are alternatives less restrictive of commercial speech that accomplish a regulatory scheme's legitimate goals, governments must use them. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490–91 (1995) (finding restriction on beer advertising unconstitutional where the "availability of [other] options, all of which could advance the Government's asserted interest in a manner less intrusive to respondent's First Amendment rights, indicate[d] that [the restriction was more extensive than necessary"); *Bd. of Trs. of State Univ. of NY v. Fox*, 492 U.S. 469, 479 (1989). Restricting commercial speech is a last resort, not the first option. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).

Moreover, the statute's regulation of commercial speech is unconstitutionally vague. "Statutes that are insufficiently clear pose three problems: (1) they punish people 'for behavior they could not have known was illegal'; (2) they lead to 'subjective enforcement of the laws'; and (3) they create a 'chilling effect on the exercise of First Amendment freedoms.'" *ArchitectureArt, LLC v. San Diego*, 231 F. Supp. 3d 828, 840 (S.D. Cal. 2017) (quoting *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009)). The statute at issue here presumes that a product is unlawful if a manufacturer or importer describes it in a manner "that explicitly or implicitly communicates that the tobacco product has a characterizing flavor." Cal. Health & Safety Code § 104559.1(d). The absence of guidance as to when a statement "implicitly communicates" a characterizing flavor is fatal. For example, does the statement that a premium cigar has "leather" or

"grassy" tasting notes "implicitly communicate[]" that the product has a characterizing flavor? What about describing a product as "sweet"? Because the statute fails to provide guidance on what actual speech will trigger the presumption, the commercial speech of premium cigar manufacturers and importers will be chilled.

## II. Plaintiffs Will Suffer Irreparable Injury if Preliminary Relief is Not Granted.

Plaintiffs will be irreparably harmed should the Unflavored Tobacco List regulatory scheme not be enjoined. First and foremost, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (quoting *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020)). "Irreparable harm is relatively easy to establish in a First Amendment case' because the party seeking the injunction 'need only demonstrate the existence of a colorable First Amendment claim.'" *Id.* (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022)). Plaintiffs have shown that they have a colorable First Amendment claim.

Second, the Unflavored Tobacco List regulatory scheme requires Plaintiffs to collectively pay millions of dollars in application and renewal fees. *See* Edney Decl., Ex. A at ¶ 8 (describing nearly $50,000 in initial application fees to date and nearly $35,000 in expected annual renewal fees); Ex. B at ¶ 8 (describing $70,000 in initial application fees to date and $50,000 in expected annual renewal fees). In addition, Plaintiffs will bear the dramatic costs of assembling applications and the substantial administrative and operational expenses incurred to ensure compliance with the Attorney General's burdensome premarket review process. *Id.*, Ex. A at ¶ 9; Ex. B at ¶ 9.

The manufacturer Plaintiffs produce and sell thousands of unique premium

cigar products, depending on blend, size, shape, and gauge. *Id.*, Ex. A at ¶ 4; Ex. B at ¶ 4. As a result of the Unflavored Tobacco List regulatory scheme, Plaintiffs will be forced to reduce the number of unique products they offer in California, resulting in attendant business losses. *Id.*, Ex. A at ¶ 10 (anticipating estimated annual revenue losses of around $875,000); Ex. B at ¶ 10 (anticipating estimate annual revenue losses of around $5 million).

It is true that "[m]onetary losses are usually not considered irreparable harm for purposes of granting a preliminary injunction." *Ass'n Des Eleveurs De Canards et D'Oies Du Quebec v. Harris*, 2012 WL 12842942, at *3 (C.D. Cal. Sept. 28, 2012), *aff'd*, 729 F.3d 937 (9th Cir. 2013). However, here, California's "Eleventh Amendment immunity would prevent Plaintiffs from recovering [their fees paid], even were they to succeed on the merits." *Id.* Because California has not waived its immunity and Congress has not created a cause of action for damages, *BV Eng'g v. UCLA*, 858 F.2d 1394, 1395–96 (9th Cir. 1988), Plaintiffs are "likely to suffer irreparable harm if a preliminary injunction is not granted." *Ass'n Des Eleveurs De Canards et D'Oies Du Quebec*, 2012 WL 12842942, at *3; *see also Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 93 (9th Cir. 2009) (holding that "monetary injuries may be irreparable if Eleventh Amendment sovereign immunity will bar a party from ever recovering those damages in federal court"); *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1039 (9th Cir. 2024) (finding irreparable harm where plaintiffs would be "unable to recover those costs later from California because of its Eleventh Amendment immunity").

Courts recognize a number of other valid grounds for finding irreparable harm, all of which apply to Plaintiffs here. These include the loss of goodwill, damage to reputation, loss of business opportunities, the loss of prospective customers, and the imposition of a competitive disadvantage. *See Stuhlbarg Int'l Sales v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("[T]hreatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable

harm."); *Int'l Franchise Ass'n v. Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) ("A rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm."). Plaintiffs will undoubtedly suffer such losses should the enforcement of the Unflavored Tobacco List regulatory scheme not be enjoined. *See* Edney Decl., Ex. A at ¶¶ 11–13; Ex. B at ¶¶ 11–13; Ex. C at ¶¶ 5–6.

Premium cigar retailers will also suffer. Premium cigar customers often have specific preferences, based on anything from variations in size and weight to the blend or vintage, and they are habitual buyers with significant brand loyalty. *Id.*, Ex. C at ¶ 3. In forcing manufacturers to withhold certain products from California, the Unflavored Tobacco List regulatory scheme thereby directly impacts the downstream retailers of those products, who will be forced to inform customers that their favorite products are no longer offered for sale. *Id.* at ¶ 5. And retailers will have little reason to visit stores if new blends and types of premium cigars dry up. *Id.* at ¶¶ 5–6.

**III. The Balance of Hardships and Public Interest Favor a Preliminary Injunction.**

Where Plaintiffs "have raised serious First Amendment questions . . . the balance of hardships tips sharply in their favor." *Hubbard v. San Diego*, 139 F.4th 843, 854 (9th Cir. 2025). Likewise, the public is interested in preventing states from encroaching on powers that have been expressly or impliedly reserved for the federal government. *See, e.g.*, *Am. Trucking Ass'ns v. Los Angeles*, 559 F.3d 1046, 1059–60 (9th Cir. 2009); *Bioganic Safety Brands, Inc. v. Ament*, 174 F. Supp. 2d 1168, 1179 (D. Colo. 2001).

The catastrophic and entirely avoidable harm to the Plaintiffs if the injunction were not to issue is detailed above. By contrast, the requested injunction will not harm any legitimate State regulatory interest. The requested injunction is very narrow, seeking to bar enforcement of the Unflavored Tobacco List regulatory scheme only as to premium cigars, as those are defined at 21 C.F.R. § 1114.3. These are products without high youth usage rates and that are unflavored. Indeed, the

Attorney General has himself noted that the Unflavored Tobacco List regulatory scheme and its extreme burdens are little more than a box checking exercise for the Attorney General with respect to premium cigars. See Declaration of Michael J. Edney, Ex. D at 1.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction to prohibit Defendant from enforcing the Unflavored Tobacco List regulatory scheme against premium cigars, as those are defined under the federal regulatory regime at 21 C.F.R. § 1114.3.

Dated: November 17, 2025

**HUNTON ANDREWS KURTH LLP**

By: /s/ *Jason J. Kim*
Jason J. Kim
Michael J. Edney
Nicholas S. Drews
Mark C. Ingram
Evan Weisberg
*Attorneys for Plaintiffs Rocky Patel Premium Cigars, Inc., Oliva Cigar Co., Piloto Cigars, Inc. d/b/a Padrón Cigars, Inc., A. Fuente & Co., LLC, Ashton Distributors, Inc., Premium Imports, Inc. d/b/a La Flor Dominicana, My Father Cigars, Inc., Cigar Rights of America, and Premium Cigar Association*

**Local Rule 11-6.2 Certification**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,997 words, which complies with the word limit of L.R. 11-6.1

Dated: November 17, 2025

**HUNTON ANDREWS KURTH LLP**

By: /s/ *Jason J. Kim*
Jason J. Kim