# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

Rocky Patel Premium Cigars, Inc., Oliva Cigar Co., Piloto Cigars, Inc. d/b/a Padrón Cigars, Inc., A. Fuente & Co., LLC, Ashton Distributors, Inc., Premium Imports, Inc. d/b/a La Flor Dominicana, My Father Cigars, Inc., Cigar Rights of America, and Premium Cigar Association,

Plaintiffs,

v.

Robert Andres Bonta, in his official capacity as Attorney General of the State of California,

Defendant.

Case No. 8:25-cv-02244-MRA(PDx)

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION [23]**

Before this Court is Plaintiffs' Motion for a Preliminary Injunction.  ECF 23.  The Court read and considered the moving, opposing, and reply papers and held a hearing on December 15, 2025.  For the reasons stated herein, the Court **DENIES** the Motion.

## I.      BACKGROUND

This action arises out of the enactment and implementation of California Assembly Bill 3218 ("A.B. 3218").  In 2020, California passed Senate Bill 793 ("S.B. 793"), which imposed a statutory sales ban on flavored tobacco products.  Cal. Health & Safety Code § 104559.5.  A.B. 3218 expands on the statutory ban on flavored tobacco products by instructing the Attorney General of California to establish and maintain a list of unflavored tobacco products ("UTL").  *See* Cal. Health & Safety Code § 104459.1(a).  A.B. 3218 sets a deadline of December 31, 2025, for the Attorney General's publication of the UTL.  *Id.* § 104459.1(m).  Under A.B. 3218, any tobacco product not appearing on the UTL after it is published shall be deemed a flavored tobacco product banned by S.B. 793.  *Id.* § 104559.1(g).

A.B. 3218 establishes various civil penalties for the sale or distribution of flavored tobacco products not appearing on the UTL.  *Id.* § 104559.1(o).  To be placed on the UTL, A.B. 3218 requires manufacturers to seek approval from the Attorney General by submitting a certification that describes each product, describes the status of the Food and Drug Administration's ("FDA's") review and authorization of the product, and certifies that the product "lacks a characterizing flavor."  *Id.* § 104559.1(b)(1)(A)–(C).  The emergency regulations promulgated to implement A.B. 3218 set forth precisely what information must be included in an application for the UTL.  Cal. Code Reg. tit. 11, § 942 *et seq.*  The regulations also provide that a product shall not be excluded from the UTL for lacking FDA authorization or approval if the FDA has indicated that the product does not require such approval.  Cal. Code Regs. tit. 11, § 948(b)(1).

Plaintiffs Rocky Patel Premium Cigars, Inc., Oliva Cigar Co., Piloto Cigars, Inc. d/b/a Padrón Cigars, Inc., A. Fuente & Co., LLC, Ashton Distributors, Inc., Premium

Imports, Inc. d/b/a La Flor Dominicana, My Father Cigars, Inc., Cigar Rights of America, and Premium Cigar Association (collectively, "Plaintiffs") are manufacturers and distributors of premium cigars as well as two trade associations focused on premium cigars. ECF 20 ¶¶ 14–19.  Plaintiffs claim that "[p]remium cigars are different than other tobacco products." *Id.* ¶ 4.  Federal regulations define premium cigars as containing "only tobacco, water, and vegetable gum with no other ingredients or additives."  21 C.F.R. § 1114.3. Premium cigars, as defined by federal regulations, are exempt from the federal premarket tobacco product application process.  *Id.* § 1114.1(d).  According to Plaintiffs, premium cigars under federal law are not and cannot be flavored tobacco products within the meaning of S.B. 793.  ECF 20 ¶ 4.

Plaintiffs  bring this action against Robert Bonta in his official capacity as Attorney General of the State of California ("the State" or "Defendant"), claiming, *inter alia*, that the UTL's regulatory scheme is unconstitutional and preempted by federal law.  ECF 1.  In their First Amended Complaint ("FAC"), Plaintiffs assert five causes of action: (1) violation of the First and Fourteenth Amendments; (2) violation of the dormant Commerce Clause; (3) violation of the Supremacy Clause (express preemption); (4) violation of the Supremacy Clause (implied preemption); and (5) violation of the Due Process Clause. *Id.* at 22–34.  The FAC seeks injunctive and declaratory relief. *Id.* at 34–35.

On October 7, 2025, Plaintiffs filed an Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Application"). ECF 9.  The Application sought an order that would enjoin Defendant from enforcing the October 9, 2025, UTL application submission deadline against premium cigars.  The Court denied the Application on the grounds that it lacked jurisdiction over Plaintiffs' state law claims that the request for emergency relief was based on.  ECF 15.  Plaintiffs have since filed their state law claims in Los Angeles County Superior Court, and they eliminated the state law causes of action from the FAC.  *Rocky Patel Premium Cigars, Inc. v. Bonta*, Case

- 3 -

No. 25STCV29644 (Cal. Sup. Ct. Oct. 28, 2025); ECF 20. Plaintiffs have also sought preliminary injunctive relief in the state proceedings. A hearing on Plaintiffs' request for a preliminary injunction was held in the state case on November 24, 2025, though no decision has been issued.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). In determining whether to grant such relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "[T]he purpose of a preliminary injunction is to preserve the status quo between the parties pending a resolution of a case on the merits." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012).

To prevail on a request for a preliminary injunction, the moving party must establish the following: (1) it is likely to succeed on the merits of its underlying claims; (2) it is likely to suffer irreparable harm unless the requested injunctive relief is granted immediately; (3) the balance of the equities between the parties tips in its favor; and (4) an injunction is in the public interest. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). "Likelihood of success on the merits is the threshold inquiry and is the most important factor" in determining whether interim, injunctive relief is warranted. *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 990 (9th Cir. 2020) (citing *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019)).

## III.    DISCUSSION

### A.    Likelihood of Success on the Merits

Plaintiffs' request for a preliminary injunction is premised on three of the claims alleged in the FAC: express preemption, implied preemption, and the First Amendment. The Court addresses each claim in turn after addressing an initial matter.

### 1.    *Section 1983 and Injunctive Relief*

The State first argues that Plaintiffs' request for preliminary relief fails because 42 U.S.C. § 1983 does not authorize prospective relief, and because § 1983 is not a proper vehicle to vindicate claims made under the Supremacy Clause.  ECF 25 at 11–12. Plaintiffs respond that the UTL statute went into effect on January 1, 2025, and that manufacturers are *currently* being compelled to comply with the imminent UTL deadline on December 31, 2025—that the *consequences* of any inaction by Plaintiffs may not be felt until later does not mean that their rights are not presently being violated.  ECF 26 at 9. Plaintiffs argue there is no authority for the proposition that the court must wait for a violation to fully happen before issuing relief.  *Id.*

The Court rejects the State's procedural arguments.  As to the State's arguments that 42 U.S.C. § 1983 is not the proper vehicle for claims for prospective relief, the State itself acknowledges that § 1983 may be used to seek prospective relief against a state official in his official capacity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). And although the State contends that Plaintiffs will not suffer any harm until the UTL is published at the end of this month of December, it does not grapple with the fact that the UTL statutory regime and its implementing regulations are already in effect and require Plaintiffs to take actions in the present to avoid the consequences of the UTL publication. The State does not cite any authority suggesting that § 1983 prevents the Court from issuing a preliminary injunction under such circumstances.

As to the State's argument regarding whether Plaintiffs may bring a separate cause of action under the Supremacy Clause, Plaintiffs correctly point out that "the [Supreme Court] has consistently assumed—without comment—that the Supremacy Clause provides a cause of action to enjoin implementation of allegedly unlawful state legislation." *Indep. Living Ctr. of S. California, Inc. v. Shewry*, 543 F.3d 1050, 1055–56 (9th Cir. 2008) (holding plaintiff "maintains a valid cause of action under the Supremacy Clause to assert [a preemption] claim for injunctive relief").

- 5 -

### 2.      *Express Preemption*

Plaintiffs' primary argument is that the Family Smoking Prevention and Tobacco Control Act ("TCA") expressly preempts the UTL regulatory scheme.  ECF 23 at 12.  The TCA is a federal statute that provides that "[n]o . . . State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to . . . premarket review . . . ."  21 U.S.C. § 387p(a)(2)(A).  Plaintiffs argue that the UTL scheme, which requires manufacturers to seek authorization from the Attorney General for a tobacco product to be included on the UTL list before the product may be sold in California, establishes an additional system of premarket review different than the requirements established by the federal system, and is therefore preempted.  ECF 23 at 12–13.  The State responds that the TCA evinces Congress's intent to broadly preserve state and local authority to regulate tobacco, including by passing sales restrictions.  ECF 25 at 13–14.  The State argues that the UTL regime is not a TCA "premarket review" process because it does not impose any requirement on the premarket review regime implemented by the FDA, and the UTL merely implements the State's lawful ban on flavored tobacco products.  *Id.* at 15–16.

The parties agree that the Ninth Circuit's decision in *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542 (9th Cir. 2022) ("*RJR*"), is the most on-point authority applying the preemption provisions of the TCA.  In *RJR*, the Ninth Circuit described the TCA as having a "unique tripartite preemption structure," comprised of (1) a preservation clause, (2) a preemption clause, and (3) a savings clause.  *Id.* at 548.  Because the TCA's tripartite preemption structure and the way these clauses interact are integral to the resolution of Plaintiffs' express preemption claim, the Court sets forth the statutory scheme in detail.

The TCA's "initial preservation clause broadly preserves state, local, and tribal authority to enact a variety of regulations that are 'in addition to, or more stringent than'

the TCA's requirements." *Id.* at 553 (citing 21 U.S.C. § 387p(a)(1)). "While under the TCA the federal government sets the regulatory floor, the plain text of the preservation clause allows state, local, and tribal governments to go beyond that, including even 'prohibiting the sale . . . of tobacco products [to] individuals of any age.'" *Id.*

Following the Preservation Clause is the express Preemption Clause, which "carves out eight limited exceptions to the preservation clause, each of which relates most obviously to the production or marketing stages—and not the retail sale—of tobacco products." *Id.* at 553–54. Specifically, the Preemption Clause provides that "[n]o State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards, *premarket review*, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." 21 U.S.C. § 387p(a)(2)(A) (emphasis added).

Finally, "[t]he savings clause immediately follows the preemption clause and 'except[s]' broad categories from preemption, including 'requirements relating to the sale . . . of[ ] tobacco products [to] individuals of any age.'" *RJR*, 29 F.4th at 555 (quoting § 387p(a)(2)(B)). The Savings Clause "reinforces what [the TCA] first established in the preservation clause: that the regulation and prohibition of tobacco product sales falls squarely within the purview of states, localities, and tribal entities." *Id.*

Plaintiffs argue that the UTL scheme falls within the Preemption Clause's carveout for "premarket review." The State argues that the UTL regime is a regulation on the sale of tobacco and thus falls within the initial Preservation Clause and the Savings Clause. Thus, the issue before the Court is whether the UTL statute and implementing regulations establish requirements relating to premarket review that are different from or in addition to those established by the TCA, such that it falls within the Preemption Clause, or whether the UTL regime establishes requirements relating to a permissible sales ban on flavored tobacco products, such that it falls within the Preservation and Savings Clauses. The Court

concludes that it is the latter, as explained below.

As Plaintiffs concede, the TCA allows the State to implement an outright ban on the retail sale of tobacco products, which the State does through S.B. 793. ECF 23 at 13 (citing Cal. Health & Safety Code § 104559.5). Indeed, states and localities have held "longstanding role[s] as the primary regulators of tobacco products." *RJR*, 29 F.4th at 548. Keeping in mind this backdrop, the text of the TCA, and the Ninth Circuit's clear instruction to protect "state and localities' traditional power to restrict or ban sales of tobacco products," *id.* at 549, Plaintiffs are not likely to succeed in showing that the TCA preempts the UTL, which acts as the State's enforcement mechanism for its undisputedly lawful ban on the sale of flavored tobacco products.

Plaintiffs argue that, notwithstanding *RJR* and the TCA's clear preservation of the State's authority to regulate sales of tobacco products, the UTL creates additional or different "premarket review" requirements prohibited by the TCA's Preemption Clause. The Court finds this argument unpersuasive for at least two reasons.

First, the Preemption Clause speaks to requirements "*under the provisions of this subchapter* relating to . . . premarket review." 21 U.S.C. § 387p(a)(2)(A) (emphasis added). In other words, the Preemption Clause applies only if the state law imposes additional or different requirements than the TCA's requirements relating to premarket review. It does not, by its own terms, prohibit a state from requiring manufacturers to seek regulatory approval as a condition of sale in the state. In that vein, *RJR* cuts against Plaintiffs' characterization of the UTL as a "premarket review" requirement within the meaning of the Preemption Clause, because that decision recognized that the "premarket review" carveout, along with the other exceptions appearing in the Preemption Clause, "relate[] most obviously to the production or marketing stages—and not the retail sale—of tobacco products." 29 F.4th at 553–554. A.B. 3218, by contrast, applies only to the sale of finished tobacco products, to ascertain whether they meet the State's definition of a flavored tobacco product. Plaintiffs offer no explanation as to how the UTL, which is the

mechanism for determining which finished products fall into the state's lawful ban, fits into the "limited production and marketing categories of preemption." *Id.* at 555.

Second, even if the UTL could be characterized as relating to the TCA's premarket review process, it is unclear how A.B. 3218 imposes any requirement that is in addition to or different from what the TCA requires. According to the implementing regulations, "[t]he Attorney General shall not exclude a [product] from the UTL . . . for lacking formal premarket authorization, approval, or order under [the TCA] if the Applicant demonstrates . . . [t]he FDA has issued a rule, guidance, or other formal statement that the [product] does not require authorization, approval, or order under [the TCA]." Cal. Code Regs. tit. 11, § 948(b)(1). In other words, products that are exempt from FDA premarket review under federal law are not subject to any additional regulatory scrutiny by A.B. 3218, provided they do not fall within the State's definition of a banned *flavored* product. The FDA has promulgated regulations exempting premium cigars from the premarket review process. 21 C.F.R. § 1114.1(d). The UTL and its implementing regulations account for that exemption and do not require premium cigar manufacturers to clear any additional regulatory hurdles not imposed by the FDA. Moreover, nothing in the TCA requires the States to borrow a product's "exempted" status under the FDA and use that status as a proxy to afford it special protection under the State's *own* laws. As Plaintiffs previously argued in their TRO Application, the State's failure to do so may be arbitrary or counterproductive to its own goals because premium cigars cannot, by definition, be a banned flavored tobacco product. ECF 9 at 17–18. Such arguments, however, pertain most directly to the now-dismissed state law claims (which are before the state court) and have no bearing on whether A.B. 3218 is expressly preempted by federal law.

Insofar as Plaintiffs claim the UTL application and fees are themselves an "additional" or "different" requirement, the Court declines to read the Preemption Clause's reference to premarket review that broadly. As *RJR* explains, the line between preempted state laws and preserved state laws can be best understood by asking whether the state law

concerns production and marketing, or whether it concerns consumer-facing retail sales. *RJR*, 29 F.4th at 555. Requiring manufacturers and distributors to affirmatively establish that a product does not fall within a statutory sales ban (and is therefore immune from enforcement), without imposing any additional requirements concerning federal premarket review, falls into the latter category.

For these reasons, even if A.B. 3218 did fall within the Preemption Clause, it would be excepted from preemption by the Savings Clause. The statute and regulations requiring manufacturers to demonstrate to the State that their products do not impart a characterizing flavor before they may sell the product is plainly a "requirement[] relating to the sale . . . of[] tobacco products." 21 U.S.C. § 387p(a)(2)(B); Cal. Health & Safety Code § 104559.1(o)(1) ("[A] distributor or wholesaler *shall not sell* any tobacco product not appearing on the UTL or any tobacco product flavor enhancer to any retailer, wholesaler, or other person for sale in California. A delivery seller *shall not sell* a tobacco product not appearing on the UTL or a tobacco product flavor enhancer to a consumer in California." (emphases added)). The UTL enables the State to ascertain which finished tobacco products are flavored and which ones are not—and the State then uses the UTL to enforce S.B. 793. Indeed, the broad language of the Preservation and Savings Clauses of the TCA would apparently allow the State to ban the sale of premium cigars altogether. There is no dispute that the State has not done that here but rather imposed a sales ban on flavored tobacco products and required tobacco companies, including premium cigar companies, to identify whether they are subject to the sales ban or not.

Plaintiffs argue that this conclusion reads the "premarket review" language out of the Preemption Clause and, if taken to its logical extreme, will enable the State to pass any regulation on tobacco products so long as it does so under the guise of a sales ban. ECF 23 at 17–18. It is true that the Ninth Circuit cautioned in *RJR* against adopting any construction of the TCA that would create "superfluity problems" or deprive any one of the three clauses of meaning. *RJR*, 29 F.4th at 554–55. But the Court is not persuaded that

rejecting preemption here creates such problems. Even if A.B. 3218 and the UTL scheme are not preempted, the reference to "premarket review" in the Preemption Clause would still have effect because it would preempt state laws that seek to interfere with the FDA's premarket review process. For example, a state law that purports to penalize manufacturers of tobacco products for making misrepresentations to the FDA during the premarket review application process, akin to the law considered in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), would ostensibly fall within the reach of the Preemption Clause. So too would a state law that redefines what constitutes a premium cigar and requires that it be subject to federal premarket review before it can be added to the UTL. ECF 25 at 16 (recognizing that the "State cannot . . . require that tobacco products obtain premarket review from the FDA when statutorily exempt from that federal requirement"). Stated differently, Plaintiffs have not demonstrated that allowing the State to implement the UTL would render the Preemption Clause meaningless.

For these reasons, the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits of their claim for express preemption.

### 3.    *Implied Preemption*

Plaintiffs also argue that A.B. 3218 is impliedly preempted because it impermissibly "creates a parallel state-level enforcement mechanism" that "is parasitic on the [Food, Drug, and Cosmetic Act] by conditioning sales based on FDA authorization status." ECF 23 at 19–20. According to Plaintiffs, a significant portion of the UTL scheme depends on a product's status with regard to federal premarket review, and the state does not have authority to impose penalties based on violations of federal law. *Id.* at 19.[1] Plaintiffs rely primarily on *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Department of Revenue*, 781 F. Supp. 3d 724 (S.D. Iowa 2025), which struck down an Iowa law requiring

---

[1] In their brief, Plaintiffs describe the implied preemption argument as one of "conflict preemption." ECF 23 at 19. At the hearing on the Motion, Plaintiffs suggested that the issue is one of "obstacle preemption." The Court's conclusion does not turn on the precise characterization of Plaintiffs' implied preemption argument.

- 11 -

manufacturers of electronic nicotine delivery systems (ENDs) to certify that they were authorized by the FDA or had sought FDA authorization in order to be included in a state directory of products authorized to be sold in the state.

The State argues that the court in *Iowans for Alternatives* "got it wrong" because the Iowa state law was not in "conflict" with any federal objective.  ECF 25 at 19.  Similarly, the State argues that, here, there is no conflict with the TCA because A.B. 3218 does not usurp any enforcement authority from the federal government, but instead "uses the FDA's determinations to delineate whether certain products are lawful for sale in California."  ECF 25 at 18.  According to the State, A.B. 3218 "at most implements permissible 'state-law causes of action that parallel federal safety requirements.'"  *Id.* (citing *Buckman*, 531 U.S. at 353).  The State cites additional cases involving similar "directory" laws where the courts determined the state law was not impliedly preempted.  *Id.* at 18 (citing *Wisconsinites for Alts. to Smoking & Tobacco, Inc. v. Casey*, No. 25-cv-552-wmc, 2025 WL 2582099, at *8 (W.D. Wisc. Sept. 5, 2025), *Vapor Tech. Ass'n v. Wooten*, No. 4:25-CV-00076-M-RJ, 2025 WL 1787420, at *5 (E.D.N.C. June 27, 2025), and *Utah Vapor Bus. Ass'n Inc. v. Utah*, 792 F. Supp. 3d 1226 (D. Utah 2025)).

In assessing Plaintiffs' claim for implied preemption, the Court must "start with the assumption that the historic police powers of the States are not preempted unless that was the clear and manifest purpose of Congress."  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quotation marks omitted).  Courts also "give[ ] great weight to Congress' inclusion of a provision preserving states' enforcement authority."  *Id.* at 1213.

The Court recognizes that there is a split in authority on the issue of whether directory laws analogous to the UTL are impliedly preempted by the TCA.  On one side of the split is *Iowans for Alternatives*, which held that such a law "st[ood] as an obstacle to the accomplishment of Congress's objective in centralizing FDCA enforcement authority in the federal government" because it "create[d] a regulatory scheme that is fundamentally

- 12 -

dependent on federal authorization status, permitting some products that the FDA currently allows through its enforcement discretion while excluding others." 781 F.Supp. 3d at 741. On the other side of the split are *Wisconsinites*, *Vapor Technology*, and *Utah Vapor*, each of which reject that reasoning to conclude that such laws do not improperly invade on federal enforcement authority.

The Court finds the latter group of cases more consistent with the text of the TCA and binding case law in this circuit. As the Ninth Circuit acknowledged in *RJR*, "[w]hile under the TCA the federal government sets the regulatory floor, the plain text of the preservation clause allows state . . . governments to go beyond that." *RJR*, 29 F.4th at 553. Here, insofar as the Attorney General relies on determinations by the FDA to ascertain which products can be placed on the UTL, the State is merely relying on the "regulatory floor" established by the FDA. This does not implicate any conflict with federal enforcement authority because "[n]oncompliance with the []TCA is not itself an actionable basis for the [State] to" initiate any enforcement proceedings. *Vapor Tech.*, 2025 WL 1787420, at *5. Rather, "a manufacturer or retailer only runs afoul of state law" by selling a banned flavored tobacco product, as determined by the UTL. *See id.*

Plaintiffs principally rely on *Buckman* and *Nexus Pharmaceuticals v. Central Admixture Pharmacy Services, Inc.*, 48 F.4th 1040 (9th Cir. 2022), to argue that conflict preemption arises when the State relies on a federal scheme to enforce its own laws. ECF 23 at 19. Neither of those cases, however, stand for the sweeping proposition that a state cannot rely on determinations made by the FDA in enforcing its own laws. Indeed, such a proposition is particularly inapt in the context of the TCA, which reflects Congress's "explicit decision to preserve for the states a robust role in regulating, and even banning, sales of tobacco products." *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 436 (2d Cir. 2013). *Buckman* held that "[s]tate-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently," with regard to the FDA's medical device approval process. 531 U.S. at 350. In *Buckman*, the Court

- 13 -

acknowledged that "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied.'" *Id.* at 347 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Tobacco product sales regulation, by contrast, "has long been subject to state authority." *Wisconsinites*, 2025 WL 2582099, at *6.  In *Nexus*, the Ninth Circuit, citing *Buckman*, held that the FDCA's prohibition on private enforcement impliedly preempted state law claims based on "a state statute which itself relies on the federal statute, not traditional state tort law theory." 48 F.4th at 1046.  A.B. 3218 does not attempt to police fraud on any regulatory agency or rely on any federal statute.  Rather, it draws on the State's historic role as the primary regulator of tobacco and uses the "regulatory floor" established by the federal government to do so.  *RJR*, 29 F.4th at 553. Neither *Buckman* nor *Nexus* involved tobacco products or the robust Preservation and Savings Clauses appearing in the TCA.

Although the court in *Iowans for Alternatives* characterized a directory law that incorporated federal premarket authorization status as "parasitic on the FDCA," the Court cannot square that characterization with *RJR* or the TCA itself.  Neither Plaintiffs nor the court in *Iowans for Alternatives* identified any authority for the proposition that, in the context of tobacco sales regulation, incorporating federal standards into a state sales' requirement constitutes "enforcement" of federal law.  And as the court observed in *Wisconsinites*, the structure of the TCA "allows states to continue or establish requirements that are the same as the TCA."  2025 WL 2582099, at *7.  The Court therefore cannot ascertain any "conflict" or "obstacle" that arises by the State's minimal reliance on the TCA in establishing sales requirements.

For these reasons, the Court concludes that Plaintiffs are unlikely to succeed on the merits of their implied preemption claim.

### 4.   *First Amendment*

Finally, Plaintiffs argue A.B. 3218 is unconstitutional because it infringes on protected commercial speech.  A.B. 3218 provides that if a manufacturer makes "a

- 14 -

statement or claim . . . that the tobacco product has or produces a characterizing flavor, including but not limited to, any text, color, or images on the product's labeling or package, that explicitly or implicitly communicates that the tobacco product has a characterizing flavor," then the Attorney General "shall presume" that the product has a characterizing flavor and may not be included on the UTL.  Cal. Health & Safety Code § 104559.1(d).  The presumption is rebuttable.  *Id.*

Plaintiffs argue that the statute "restricts the manner in which premium cigar manufacturers and importers may describe their products and thus their commercial speech."  ECF 23 at 21–22.  Rather than merely attaching consequences to the product itself (*i.e.*, whether it is flavored), the UTL "attaches legal consequences to the very words that premium cigar manufacturers and importers use to describe the taste of their products."  *Id.* at 22.  Like wine and whiskey makers, premium cigar producers regularly use aromas and other tastes or flavors to describe their products, even though the cigars have no added flavors.  *Id.*  For example, one Plaintiff describes its cigars as having notes of "cocoa, cedar, leather, caramel, and spices."  *Id.*  This description, according to Plaintiffs, triggers the rebuttable presumption that the products are unlawful, even though the products themselves contain no flavor, and the presumption thus sweeps in more speech than is necessary to achieve the State's goals.

The State argues that the UTL does not restrict any speech because it creates a rebuttable presumption that Plaintiffs can easily defeat.  ECF 25 at 20.  The consequences of using descriptive words, the State argues, do not punish Plaintiffs for their views; rather, they impose consequences for failure to comply with the UTL.  *Id.* at 20–21.  The State further argues that even if the law did restrict speech, the presumption is narrowly tailored to the government's interest in banning flavored tobacco products because it allows manufacturers to rebut the presumption, and alternative avenues remain available for the speech at issue.  *Id.* at 21.

As a threshold matter, the Court agrees with Plaintiffs that subsection (d) of A.B.

3218 triggers First Amendment scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). The State's position that the rebuttable presumption under A.B. 3218 does not "restrict speech" is unavailing because "the distinction between laws burdening and laws banning speech is but a matter of degree." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011); *Doe v. Harris*, No. C12-5713 TEH, 2013 WL 144048, at *3 (N.D. Cal. Jan. 11, 2013) ("The provisions at issue here are not outright bans on anonymous online speech, but they may still violate the First Amendment if they impermissibly burden such speech."). Although the State contends that the presumption created by a manufacturer's use of flavor descriptions may be rebutted, it cannot contest that attaching regulatory consequences creates a burden, even if minimal, on speech. *See Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 502 (Kagan, J., dissenting) ("The First Amendment prevents making speech hard, as well as banning it outright.").

The State also argues that A.B. 3218 is a valid regulation that is "unrelated to the communication of ideas" and does not punish "Plaintiffs for their views." ECF 25 at 20–21. But the State does not meaningfully contest that a manufacturer's description of its product, including flavor characteristics, constitutes "commercial speech" entitled to First Amendment protection. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021) (recognizing that commercial speech is found where speech is an advertisement, refers to a particular product, and the speaker has an economic motivation). "Although the Constitution accords lesser protection to commercial speech than other constitutionally guaranteed expression, it still protects commercial speech from unwarranted governmental regulation." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 459–60 (9th Cir. 2018). Thus, A.B. 3218 triggers First Amendment scrutiny and is subject to the *Central Hudson* test for evaluating restrictions on commercial speech.

The dispute as to Plaintiffs' First Amendment claim boils down to whether the A.B. 3218's creation of a rebuttable presumption where a manufacturer describes its product as

having a characterizing flavor is narrowly tailored to serve the State's interest in banning flavored tobacco products. The Court concludes that it is. As the State points out, the law allows a manufacturer to demonstrate that, notwithstanding any statements, its product is a permissible unflavored tobacco product. According to the State, as to premium cigar manufacturers, this presumption may be rebutted by establishing that the product itself is a premium cigar exempt from FDA premarket review (which is itself sufficient to demonstrate that the product is eligible for the UTL). Thus, rebutting this presumption apparently imposes no additional burden than what is required to demonstrate that a product is not a flavored tobacco product banned by S.B. 793 in the first instance.

In the context of flavored tobacco products, a manufacturer's description of its own products does not necessarily impart any knowledge to a consumer or enforcer as to whether the product does in fact contain a banned "characterizing flavor." The UTL does not prohibit manufacturers from using any descriptions but merely seeks to further the goal of ferreting out flavored products by drawing special attention to those products that the manufacturer itself describes as being flavored. There is thus a close "fit between the legislature's ends and the means chosen to accomplish those ends." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (citation omitted).

Plaintiffs proffer several alternatives the Legislature might have adopted to achieve the goal of eliminating flavored tobacco products from the market. ECF 26 at 17. But the law is settled that "the least restrictive means test has no role in the commercial speech context." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995). In other words, the First Amendment does not require that the State adopt Plaintiffs' alternatives that may be less restrictive. The Legislature's chosen means for accomplishing its objective should "represent[] not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* (quotation marks and citation omitted). The Court concludes that subsection (d)'s rebuttable presumption is proportionate to the interest served by A.B. 3218 and S.B. 793. Plaintiffs may continue to describe the flavor of their premium cigars

- 17 -

using flavorful terms, so long as they identify those "flavorful" cigars as in fact being unflavored—and therefore not subject to the State's ban on flavored tobacco products.

For these reasons, the Court concludes that Plaintiffs are unlikely to succeed on the merits of their First Amendment claim.

## B.     **Remaining *Winter* Factors**

If the moving party fails to show a likelihood of success on the merits, the court "need not consider the remaining three [*Winter* elements]." *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (citing *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)). In other words, even if Plaintiffs could establish a risk of immediate and irreparable harm, "the existence of irreparable harm alone is insufficient to warrant the issuance of a preliminary injunction." *Nitro NRG Corp. v. Liquid Nitro Beverages, Inc.*, No. EDCV162315JGBDTBX, 2017 WL 2964802, at *7 (C.D. Cal. Jan. 17, 2017); *see also Wisconsinites*, 2025 WL 2582099, at *9.

Moreover, Plaintiffs implicitly acknowledge that the remaining *Winter* factors—the balance of equities and public interest—are driven, at least in part, by the likelihood of their success on the merits of their preemption and First Amendment claims. ECF 23 at 27. Plaintiffs argue that the requested injunction, which is limited to those products that the Attorney General has already noted are eligible for placement on the UTL, will not harm any legitimate state interest. ECF 23 at 27. The State argues that the proposed injunction will interfere with A.B. 3218's objective of creating a single list of approved unflavored tobacco products and complicate the Attorney General's review of applications. ECF 25 at 26. It further argues that the UTL allows Plaintiffs to make informed business decisions to mitigate any potential harm, and that the UTL grants extensive rights to challenge the Attorney General's approval or enforcement decisions. *Id.* at 27. The Court finds that the State has demonstrated a compelling interest in the uniform enforcement of its laws designed to promote public health, and Plaintiffs do not address why the UTL's system for challenging determinations made by the Attorney General is inadequate to

safeguard against potential harm.

In sum, even if Plaintiffs established irreparable harm, the remaining *Winter* factors, including the "most important" factor—likely success on the merits—weigh against the issuance of a preliminary injunction. *Garcia*, 786 F.3d at 740.

## IV.    **CONCLUSION**

For the reasons stated in this Order, the Motion for Preliminary Injunction [23] is **DENIED**.


**IT IS SO ORDERED.**


DATED: December 23, 2025

_____
MONICA RAMIREZ ALMADANI
UNITED STATES DISTRICT JUDGE